**JULIE R. PATTEN**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**2601 Second Ave. N., Suite 3200**
**Billings, MT 59101**
**Phone: (406) 657-6101**
**Fax: (406) 657-6989**
**E-mail: Julia.Patten@usdoj.gov**

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** <br><br> Plaintiff, <br><br> vs. <br><br> **JOSE ANTONIO ESCOBEDO,** <br><br> Defendants. | **CR 19-113-BLG-SPW** <br><br><br><br> **RESPONSE TO MOTION TO SUPPRESS EVIDENCE** |

### INTRODUCTION

Defendant Jose Escobedo requests the Court suppress all evidence obtained as a result of the search warrant of a package of methamphetamine sent to Escobedo and the subsequent search of his residence in Billings, Montana, upon the receipt of the package.

1

The house was searched pursuant to a valid anticipatory search warrant issued by Montana District Court Judge Jessica Fehr, which this Court reviews deferentially. The warrant was based upon an abundance of probable cause, specifically, a package containing methamphetamine was addressed to Escobedo. Law enforcement began investigating Escobedo after discovering various money transfers to individuals in McAllen, Texas, a border city known for the importation of methamphetamine. Escobedo challenges the basis of the investigation – the information regarding wire transfers made by him through a third party service to individuals in McAllen, Texas which led investigators to find associated corresponding packages sent to him, one of which contained methamphetamine.

Because the information obtained pursuant to the Custom Summonses was not the impetus for the investigation, or even included in the search warrant, there was no Fourth Amendment violation. Moreover, Escobedo had no legitimate expectation of privacy in the wire transfers because he voluntarily turned over this information when he used a third-party service.

Accordingly, the Defendant's motion should be denied.

## FACTUAL BACKGROUND

An investigation began into Escobedo after Task Force Officer (TFO) Matt Henderson found suspicious activity regarding wire transfers from Escobedo to McAllen, Texas. TFO Henderson is a Border Patrol agent assigned to the FBI Big Sky Transactional Organized Crime West Task Force. As a law enforcement

officer, he has access to the Southwest Border Transaction Record Analysis Center (TRAC) which obtains person to person money services business transactions concentrated in southwest border-states and Mexico. TRAC was created by a Settlement Agreement Amendment between Western Union and the Arizona Attorney General in January 2014. Western Union agreed to deliver transaction data related to all transactions sent to or from locations with the Southwest Border Data Area involving transactions in amounts of $500 or more. The Southwest Border Data Area includes the states of California, Arizona, New Mexico, and Texas, and the country of Mexico.

The TRAC data system is located online at www.swbtrac.com. The data is a result of the information provided by Western Union, in addition to other money services business, pursuant to a subpoena. TRAC is an investigative tool utilized by law enforcement in the investigation of transnational criminal organizations involved in money laundering related to human trafficking, human smuggling, narcotics trafficking, and terrorism.

To use TRAC, law enforcement officers search transactions based upon a search criteria. For example, an officer can search when a customer uses a false address, multiple addresses, or sends several transfers in a short time period.

In this case, TFO Henderson was investigating suspicious person to person transactions using TRAC. He entered a search criteria of paid in Billings, Montana and sent to McAllen, Texas. He identified a series of transactions sent by Escobedo to McAllen, Texas. The frequency and dollar amount were suspicious. He provided that information to Detective Tanner Buechler of the Eastern Montana High Intensity Drug task force (EMHIDTA).

Detective Buechler identified a physical address for Escobedo at 1042 North 24th Street in Billings. Detective Buechler suspected Escobedo was possibly using these person to person transfers to obtain drugs via mail so he contacted United States Postal Inspector Mike Smith. Postal Inspector Smith discovered Escobedo had received several packages from McAllen, Texas and had received one on August 12, 2019. Investigators conducted a K9 sniff on the package and it alerted to the presence of narcotics. Postal Inspector Smith obtained a search warrant for the package and located 254.9 grams of a crystal substance that was later confirmed to be methamphetamine. Investigators removed some of the methamphetamine and replaced it with rock salt in order to conduct a controlled delivery.

Detective Buechler obtained an anticipatory search warrant for Escobedo's house from Montana District Court Judge Jessica Fehr. On August 13, 2019, task

force officers conducted a controlled delivery. Escobedo retrieved the package and entered his home. At this point, the search warrant was executed and the package containing the meth and rock salt was discovered inside.

On August 29, 2019, well after the search warrant was issued and the search was executed, Custom Summonses were served on Western Union and RIA Financial to obtain the transaction information on Escobedo's money transfers. On September 10, 2019, TFO Michael Robinson received records from Western Union and RIA Financial in regards to the person to person money transfers from Jose Escobedo. The Western Union records showed Escobedo sent money six times from May 7, 2019 to July 6, 2019. Four of those transactions were to Robert Esquivel, one to Nancy Buenrostro, and one to Briana Ban. These records were obtained pursuant to a Department of Homeland Security Summons under 19 U.S.C. § 1509. Section 1509 provides that the U.S. Customs Service may issue a summons for records that "may be relevant to" an investigation "for insuring compliance with the laws of the United States administered by the United States Customs Service." 19 U.S.C. § 1509(a).

Western Union outlines its terms and conditions with each transaction. Specifically, it advises customers transactions "may be reported to applicable authorities." The privacy statement specifically advises that Western Union "may

collect and disclose personal information to third parties." It further states this information may be shared with government agencies.[1]

RIA Financial also outlines its terms and conditions with each transaction. Much like Western Union, RIA outlines that money transfers "will be reported to federal, state, local or foreign authorities" when required by law.[2] On the receipt located during the search of Escobedo's residence, a RIA Financial receipt for a money transfer was located. The receipt expressly states "I further acknowledge that this transaction is subject to RIA's terms and conditions provided with this transaction and that I agree to these terms and conditions." Receipt attached hereto as Exhibit A.

When Escobedo used a third-party service to send money, he agreed to the company's terms and conditions. All information provided to the TRAC database was done so with either the express consent of the company and its clients, or in accordance with a subpoena or statutory authority.

## ARGUMENT

I. **Because the defendant used a third party to send money, he had no legitimate expectation of privacy in those transactions.**

The defendant did not have an expectation of privacy in his Western Union

---

[1] https://www.westernunion.com/us/en/terms-conditions.html

[2] https://us.riafinancial.com/en/legal/terms-and-conditions

6

money transfers because he used a third party service to send the money and therefore subjected his financial and personal information to the public. By using that service and agreeing to Western Union's terms and conditions, he specifically waived any privacy interest he had.

      The Fourth Amendment protects persons from unreasonable searches and seizures. Warrantless searches and seizures are per se unreasonable absent a judicially recognized exception. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967). The defendant bears the burden of establishing "that his own Fourth Amendment rights were violated by the challenged search or seizure. *Rakas v. Illinois*, (1978), 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387. The "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, (1978), 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387. When there is no reasonable expectation of privacy, there is neither a "search" nor a "seizure" within the meaning of the Fourth Amendment.

      "It is well-established that individuals do not have a legitimate expectation of privacy in items that are exposed to third parties." *United States v. Lozano*, 623 F.3d 1055, 1063 (9th Cir. 2010). The Supreme Court has asserted that "[w]hat a

person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz,* at 351. A customer has no legitimate expectation of privacy in information voluntarily turned over to third parties. *Smith v. Maryland,* 442 U.S. 735, 743-44, (1979); *United States v. Miller,* 425 U.S. 435, 442-444(1976).

Specifically, the Supreme Court has applied this doctrine to bank records. In *United States v. Miller,* the Court addressed whether a bank customer has a privacy right in bank records maintained concerning deposits made and checks written on accounts. The Court applied the third-party doctrine to subpoenas for bank records reasoning that a customer "takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the government." *Miller,* 425 U.S. 435, 443. Because the depositor "assumed the risk" of disclosure, the Court held that it would be unreasonable for him to expect his financial records to remain private.

The Court held a bank customer has no reasonable expectation of privacy in financial information he voluntarily provided to the bank for use in its ordinary course of business. *Miller,* 425 U.S. at 442.

In *Smith,* the Court considered whether the use of a pen register which recorded numbers dialed from a phone line constituted a search under the Fourth

Amendment. The Court held it was not because an individual did not have a reasonable expectation of privacy in numbers he dialed from his telephone because he voluntarily provided that information to the telephone company. *Smith,* 442 U.S. at 742-745. The Court distinguished pen registers from techniques used to acquire the content of the calls because the pen register only obtained information associated with the calls. The Court looked at the conduct of the defendant and while he may have calculated to keep the contents of his conversation private, his conduct to preserve the privacy of the numbers dialed was not.

In the years subsequent, the Ninth Circuit has applied the rationale in *Miller* and *Smith* to hold that there is no reasonable expectation of privacy in similar types of information contained in business records resulting from customer relationships. *See United States v. Golden Valley Elec. Ass'n,* 689 F.3d 1108, 1116 (9th Cir. 2012) (power company consumption records); *United States v. Cormier,* 220 F.33d 1103, 1108 (9th Cir. 2000) (motel registration records).

Much like in *Miller* and *Smith*, Escobedo assumed the risk that information regarding his money transfers would be disclosed when he used a third party to send money. Moreover, he acknowledged and waived any privacy right he had in his financial information when using that service. Both Western Union and RIA Financial require a customer to acknowledge the terms of service that outlines

information is subject to disclosure.

The information disclosed through the TRAC database is non-content information and subject to the third-party doctrine. Investigators learned his name, to whom and the location he was sending money. There was no further content information. In fact, Detective Buechler took the information from TFO Henderson and had to ascertain his address through another record management system. When Escobedo used a third-party service to send money, he voluntarily conveyed information to that third-party waiving any privacy right he may have had.

The records of the money transfers obtained pursuant to the Custom Summons was lawful part of an ongoing investigation and there was no statutory violation. Escobedo agrees Custom Summons may be used to gather documents in an ongoing investigation. He argues these records prompted the investigation, but that is not the case. The information from TRAC was the impetus for the investigation. The summonses were only issued after the investigation began and the search warrants executed on the package and Escobedo's residence. The content of the money transfers was not in law enforcement's hands until September 10, 2019. There was no statutory violation because the records were obtained in the course of the investigation. Moreover, even if there had been a statutory violation involved in the use of the summonses it would be entirely unrelated to the already

executed search warrant and irrelevant to Escobedo's motion.

Escobedo has no legitimate privacy right in the information regarding his money transfers. When Escobedo used third party services to send money, he assumed the risk his information may be disclosed to law enforcement. Furthermore, he expressly acknowledged so when he agreed to use their services as outlined in their terms and conditions referenced on all receipts. Finally, the information obtained via Custom Summonses was not the impetus for the investigation. Rather, that information was obtained as part of an ongoing investigation, weeks after the issuance and execution of the search warrants.

## CONCLUSION

The United States respectfully requests this Court deny Escobedo's motion to suppress evidence.

DATED this 24th day of October, 2019.

                KURT G. ALME
                United States Attorney

                /s/ *Julie R. Patten*
                Assistant U. S. Attorney
                Attorney for Plaintiff

## CERTIFICATE OF COMPLIANCE

Pursuant to D. Mont. LR 7.1(d)(2) and CR 47.2, the attached response is proportionately spaced, has a typeface of 14 points or more, and the body contains 2,099 words.

>*/s/ Julie R. Patten*
>JULIE R. PATTEN
>Assistant U.S. Attorney

## CERTIFICATE OF SERVICE
## L.R. 5.2(b)

\* \* \*

I hereby certify that on October 24, 2019, a copy of the foregoing was served on the following persons by the following means:

| | |
|---|---|
| __1, 2__ | CM/ECF |
| _____ | Hand Delivery |
| _____ | Mail |
| _____ | Overnight Delivery Service |
| _____ | Fax |
| _____ | E-Mail |

1. Clerk, U.S. District Court

2. Gillian Gosch
   Attorney for Defendant


*/s/ Julie R. Patten*
JULIE R. PATTEN
Assistant U.S. Attorney